Jennie Guettel, Joseph Bibergall, and John C. Krueger, Appellees, v. Herbert E. Hillebrecht, Jay C. McCord, Walter Wade, Trustees, and Congress Building Corporation, Appellees, Balaban and Katz Corporation, Appellant.

**Gen. No. 45,534.**

Opinion filed May 5, 1952. Released for publication June 9, 1952.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, of Chicago, for appellant; EDWARD P. MORSE, of Chicago, of counsel. HARRY A. BIOSSAT, MURAL J. WINSTIN, ARTHUR A. SULLIVAN, and BENJAMIN WHAM, all of Chicago, for defendants-appellees.

SHULMAN, SHULMAN & ABRAMS, of Chicago, for plaintiffs-appellees; BERNARD SHULMAN, MILTON K. JOSEPH, and LOUIS I. SCHUBERT, all of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Balaban and Katz Corporation, respondent to a rule to show cause in this proceeding, entered July 21, 1950, appeals from an order of the circuit court entered April 24, 1951, providing in substance for the specific enforcement of an alleged sale of certain assets of Congress Building Corporation to it, and, as an incident thereto, from a series of so-called interlocutory orders collateral to the issues of the principal litigation between plaintiffs and defendants herein, in which respondent was not a party nor in any wise involved.

Jennie Guettel and others initiated the main litigation on May 20, 1946 by filing a complaint in equity against Congress Building Corporation and three voting trustees under a trust agreement dated May 18, 1936, relating to the stock of the corporation. The corporate property consists of several parcels of land on Milwaukee avenue at Rockwell street, improved with four buildings constructed so as to give the appearance of a single unit; one of these is a theatre building with an entrance lobby on Milwaukee avenue adjoining the corner. In 1936 the property was placed in trust under

106

a reorganization plan, with the primary object liquidation of its assets as soon as there was an available market. Plaintiffs are the registered holders of 70 units of a total of 12,390 issued. They alleged that during the ten years of their tenure of office the trustees made no attempt to sell or liquidate the trust property, as was contemplated under the terms of the trust indenture; that on April 1, 1946 the trustees, by resolution, extended the trust to May 18, 1951, contingent upon approval by 51 per cent of the certificate holders; that plaintiffs were refused access to the list of registered owners of certificates which they desired to use for the purpose of having a sufficient number of them join with plaintiffs in opposition to the extension; that the trustees improperly influenced certificate holders to vote in favor of the extension; and plaintiffs sought a decree holding that the vote thus obtained be decreed of no force and effect, that the extension be held to be void, and that the court direct the trustees to immediately advertise the premises for sale, the court to pass upon the form, notice and terms of the sale, and if fewer than the required holders of certificates still objected to the sale, then the sale to be held in court.

On October 15, 1946 an order was entered striking from the complaint all the prayers except that with respect to the sale of the property. The order directed that the trustees continue their efforts to make a satisfactory sale of the assets of the corporation or of its stock, and that on or before eight months thereafter they report their progress to the court; and it provided specifically that the provisions of the order "shall not be construed as an order that said assets or stock shall be sold."

In a supplemental amendment to the complaint filed August 1, 1949, plaintiffs sought further to have the

court find and determine that the acts of the officers, directors and trustees, as alleged in the complaint, were illegal or fraudulent; that the payment of commission to one of the trustees was improper and excessive; that the extension of the trust was illegal and void; that Hillebrecht was disqualified to serve as a voting trustee or as an officer and director, that the appointment of Benjamin Wham as successor trustee subsequent to the acquisition of the jurisdiction by the court was void and without force and effect, and that he be disqualified to serve; that the trust property either be sold at an upset price of not less than the bid made by the lessee or, in the alternative, that the court direct a liquidation of the corporation pursuant to section 86 of the Business Corporation Act; and plaintiffs prayed that an order be issued restraining the corporation and trustees from encumbering the property or taking any steps inconsistent with the relief prayed for until the further order of the court. On oral argument counsel stated that the case is not at issue; no decree or order has been entered on the merits as to any issue raised on the complaint or supplement thereto, nor has any decree or order been entered on the merits of the cause or for the sale, liquidation or disposition of any of the assets of the corporation.

On March 1, 1950, an informal conference was held in the chambers of JUDGE PRYSTALSKI relating to the sale of the real estate and personal property of the corporation, at which the court and counsel for all parties were present. Balaban and Katz Corporation, which was not a party to the main litigation, was represented at that conference by C. D. Satinover, who appeared at the request and invitation of the trustees. At that conference respondent verbally offered to pay $540,000 for the real and personal property. On March 7, 1950, following the conference, a petition for in-

108

structions was filed by the defendant building corporation and the trustees reciting the offer which they characterized as "fair and reasonable," and which, they felt, "should be accepted," and they prayed that an order be entered "authorizing and directing petitioners to execute and deliver to Balaban & Katz Corporation, a contract for the sale of all of the assets of said Congress Building Corporation for the sum of Five Hundred Forty Thousand Dollars ($540,000.00) subject to submission of said agreement to the certificate holders" for approval. In the several hearings which followed, JUDGE PRYSTALSKI and counsel for the trustees both recognized that at most the court was merely acting in an advisory capacity, as appears from the following excerpts from the record; the trustees were advised by their counsel that they could act independently of the court under the broad powers conferred upon them in sections 1 and 2 of article IV of the trust instrument, but that to do so might be taken as an affront to the court, and others might take exception to it. "The Court: After all, the trustees are appointed to consider the situations and their powers, in the petition that you filed, which sets forth some of their powers, their powers are very broad.

"Mr. Biossat [attorney for the trustees]: They are.

"The Court: And they can act without me.

"Mr. Biossat: I grant you that, and I so abide by it." Then, reading from the trust agreement, the court referred to the broad powers of the trustees to not only vote the stock but to sell, mortgage, pledge or lease it, and continued as follows: "Well, if these trustees have the power to sell all of the property of the corporation, it isn't in my province to say that they should be sold, that the corporate assets should be sold. It is their problem. I will, if they make a recommendation to me, I will back them up. I will try to

follow their recommendation. They have now two bids. This is not a trial. This a matter for the—

"Mr. Biossat: For the trustees to act upon.

"The Court: For the trustees to act upon, and it was brought to my attention, and it is here, and if the trustees want to act on it, they have my blessing to act on it. . . . For two years that I know of, approximately two years, they have been trying to sell this property. They have not been able to do it, and now the thing came up to a sale, the other day, for $540,000.00. That price is now raised to $600,000.00 [a bid subsequently made on behalf of David W. Pollock]. . . . All I am interested in is the sale or proceedings that will lead up to the sale.

"Mr. Wade: To protect the security holders.

"The Court: Yes. Now, the matters of detail as to the contract are matters of future consideration, and I will take care of them. But a sale is being made on a general proposition of a sale, and there is to be a statement made as to the amount of taxes that one shall pay, rents, and all of those things are to be adjusted, as is done in the ordinary case. Now that is all that is before me."

At the last of several hearings before JUDGE PRYSTALSKI on April 12, 1950 he referred the matter to JUDGE HARRINGTON with the comment: "I don't want it any more. I want things that are ready. Send it to Judge Harrington for the 26th. You can tell him about it. It won't take long." After the matter was referred to JUDGE HARRINGTON, further hearings were had, during which he entered the several orders that are the subject matter of this appeal. JUDGE HARRINGTON was unaware that there were no orders authorizing or directing a sale of the property, and was undoubtedly under the impression that the matter had been referred to him for the sole purpose of carrying on the sale. This is indicated by the following (on May 4, 1950):

110

"Mr. Satinover: Before directing my attention to the amount of the bid, I would like to take just a minute or two to indicate our position in the matter. We are not parties to this proceeding. There has been controversy among the Trustees for some time as to certain issues which are not important here, and I think your Honor referred that matter to the Master for hearing. It was obvious apparently to the Trustees that all that that would result in would be long extended litigation, and I have been informed, I was informed that Mr. Biossat with the consent of the Trustees, determined to present a petition to the Court, in effect, seeking the Court's advice and help in disposing of the case, it apparently being agreed that the solution of the case would be to sell the property. I was invited by the Trustees to come into the hearing which the Judge [JUDGE PRYSTALSKI] held with respect to the petition.

"The Court: Listen, I don't care about that. What do you want to bid?

"Mr. Satinover: I have bid $605,000.00.

"The Court: And you represent Balaban & Katz?

"Mr. Satinover: Yes.

"The Court: Now, what do you folks want to do?

"Mr. Altheimer [representing David W. Pollock, another bidder]: If the Court please, I will raise the bid to $607,500.00.

"Mr. Satinover: $610,000.00.

"Mr. Altheimer: $612,000.00.

"Mr. Satinover: $615,000.00.

"Mr. Altheimer: $620,000.00.

"Mr. Satinover: $625,000.00.

"Mr. Altheimer: If the Court please, I have given my last bid, except that I will bid $725,000.00 for the property free and clear of the Balaban & Katz lease, No. 1, and No. 2, if your Honor will put this over until next week, I will come in with higher bids.

111

"Mr. Brill: This matter has been continued, your Honor, I think it is about the sixth time.

"The Court: Never mind. It is improving with age. Gentlemen, the case will be continued until two weeks from today, and [addressing Mr. Shure who represented other certificate holders] I will take you up on your proposition of the ad, and I won't hold you, as far as repayment of the ad, to an excess of $605,000.00, the first bid here today. I will give you credit.

"Mr. Shure: In other words, the proposition is we will do the advertising and get it back. Now, your Honor continued it for two weeks. Your Honor, these movie magazines are published once a week. I don't know what the closing date is. It is going to take a few hours to write an ad. I will get busy right away.

"The Court: Two weeks from today."

The court then entered an order continuing the hearing to May 18, 1950, gave certain certificate holders represented by Mr. Shure the right to advertise for higher bids at the expense of the building corporation, and provided that at the hearing of May 18, 1950 "the court will receive any further or other bids higher or better than the bid of $625,000.00 this day made in open court by Balaban & Katz." After further continuances, the matter next came on for hearing on May 29, 1950.

During the first hearing before JUDGE PRYSTALSKI in March 1950 on the petition for instructions, a draft of contract for the purchase of the property for $540,000 had been prepared, and respondent had signed it and also an uncertified earnest-money check for $50,000, dated March 13, 1950, payable to Winston, Strawn and Shaw. The check was held by Mr. Wade and later turned over to Mr. Biossat who had it in his possession continuously thereafter; it was never deposited. A like deposit of $50,000 was made on

behalf of David W. Pollock, who became a bidder after the respondent made the original offer of $540,000.

At the outset of the hearing on May 29, 1950 before JUDGE HARRINGTON, respondent withdrew its bid of $625,000, and its counsel, Mr. Satinover, made the following statement: "I regret what I have to say. What I say is dictated by current conditions. We have been authorized by our New York Board of Directors to withdraw the offer on behalf of B. & K. I think perhaps the Judge may know, but anyway I will state that a cataclysm has hit the movie business. It has been on the downgrade, but it has taken a tremendous downgrade even in the time that intervened from the last continuance until today"; and he thereupon presented comparative figures as to the gross receipts at the Congress Theatre in the second quarters of 1949 and 1950, indicating a drop of over 30 per cent during that period. Thereupon Mr. Biossat, representing the trustees, objected to the withdrawal. The court refused to recognize the withdrawal of the offer by Mr. Satinover on behalf of respondent, saying: "This sale was continued until today for the purpose of getting the highest and best bid, at the request of counsel who represents the parties, and that is what the Court is here for today. There being no higher bid, the $625,000.00, as far as the Court is concerned, is the figure that this Court would approve, if it met with the provisions of the trust agreement and these bondholders that have the right to dissent or assent as far as the sale of the property is concerned. . . . I have disposed of the bid." No order was entered that day, but four days later there followed the order of June 2, 1950, which was entered *nunc pro tunc* as of May 29, 1950, without benefit of any minute or memorial in writing, and which purported to accept and approve the $625,000 bid of respondent.

After this order was entered the trustees proceeded to submit the question of the acceptance of respondent's bid to the trust certificate holders, as provided in the order of June 2, 1950, and reported to the court that dissents had been filed by the holders of certificates representing 5,847½ shares out of a total of 12,390 outstanding; and that one dissent, representing 5,319½ shares, had been filed by George Hoffman, nominee for respondent. JUDGE HARRINGTON evidently thought that there had been a previous ruling on the question of dissent filed by respondent's nominee because he said that "to be consistent with the previous Court ruling I could not do anything else but hold they could not dissent." The record discloses, however, that JUDGE PRYSTALSKI had taken quite the contrary position; this is clearly indicated in a colloquy between court and counsel at the hearing of March 15, 1950, wherein JUDGE PRYSTALSKI had commented that he did not say he was going to enter an order to the effect that the stock held by Balaban and Katz should not be allowed to dissent, and had added that, as he viewed the situation then, he saw "no reason why they should be put in a position different from any other shareholder." It was without knowledge of JUDGE PRYSTALSKI's attitude that JUDGE HARRINGTON, on June 28, 1950, entered the order providing, among other things, that the dissents filed by respondent's nominee be not considered or treated as valid dissents, "and there being insufficient dissents filed to the said sale heretofore held herein, it is ordered that the said sale is confirmed and should be consummated by the said Voting Trustees and said Congress Building Corporation."

On July 21, 1950 the rule was entered requiring respondent "to show cause why it should not complete the sale and purchase of the premises described in the complaint and pay the amount of the purchase

114

price pursuant to the order heretofore entered in this cause.'' August 16, 1950, following the entry of a special appearance by respondent for the sole purpose of objecting to the jurisdiction of the court over its person, an order was entered denying the motion of respondent that the rule to show cause, entered July 21, 1950, be discharged because of the lack of jurisdiction over the person of respondent. An answer was then filed in which respondent asked that the rule be discharged, and on April 24, 1951 the court ''ordered, adjudged and decreed that the foregoing sale be specifically enforced and completed and the purchaser at the sale, Balaban & Katz Corporation, be and is hereby adjudged liable to the Congress Building Corporation for the full purchase price in the sum of $625,000; . . . .''

As a result of this anomalous proceeding, in which no testimony or evidence was offered or received and no decree or order had been entered on the merits as to any issue raised by the complaint or its supplement, and no decree or order entered for the sale, liquidation or other disposition of any of the assets of the corporation, and to which respondent was not a party and had not been served with anything resembling process until it was given a certified copy of the rule to show cause, to which it responded by entering its special appearance and moving to discharge the rule because of lack of jurisdiction of the court over the person of respondent, the three orders of June 2, June 28 and July 21, 1950 were entered. As an effect of these orders it was sought to hold respondent to its bid on May 4, 1950 in the sum of $625,000, notwithstanding the withdrawal of that bid before it was accepted, and through the issuance of a rule, to specifically enforce completion of the purchase of the property by respondent at the full purchase price of $625,000.

115

As the principal grounds for reversal it is urged (1) that the orders of June 2, June 28 and July 21, 1950 were void for lack of jurisdiction of the trial court over the person of respondent which was not a party to the main litigation and had not been served with process until it was given a certified copy of the rule to show cause; (2) that the court had no jurisdiction to enter the orders of June 2 and June 28, 1950 or to conduct the sale of property of the corporation by open bidding such as took place; (3) that the bids were not made in the course of a judicial sale; (4) that respondent withdrew its bid before it was accepted, and had a right to do so; and (5) that the court erred in declaring that the dissent of George Hoffman, nominee for respondent, was invalid. Before discussing these various propositions, we advert to the contentions of the appellees that the orders of June 2 and June 28, 1950 were final orders, and since no appeal was taken from them within the statutory period, they were binding on respondent and no longer subject to attack. As authority for this contention their counsel cite and rely on *Madison & Kedzie State Bank v. Cicero-Chicago Corrugating Co.*, 351 Ill. 180, and *Smietanka v. Myers*, 311 Ill. App. 91, holding that orders which confirm or set aside sales in foreclosure or partition, are final orders. In both those cases, unlike the situation in the instant proceeding, the orders were preceded by a decree or order of sale, and were final. The two orders involved in the instant proceeding could not have been final because they did not order respondent to do anything, nor did they order the trustees or the corporation to consummate the sale. Indeed, it would not have been possible to ascertain from those orders what property was to be sold, and without an adequate description of the property the court could not, without further proceedings, specifically enforce either of them; in that respect they certainly lacked

116

the requisites of finality. Evidently, neither the court nor appellees regarded the June 1950 orders as final. This is apparent from a comparison of those orders with the admittedly final order of April 24, 1951, all drawn by the same counsel and entered by the same judge. The June 1950 orders were concerned only with a purported acceptance of a bid and the dissent filed by respondent; neither of them laid the foundation for a resale to establish a measure of damages. The final order of April 24, 1951, on the other hand, made findings of facts, stated the purchase price, described the property by reference to the complaint, ordered respondent to pay $625,000, ordered the corporation to execute a deed and bill of sale and all other documents necessary to consummate the sale, and fixed a time for compliance by respondent with the decree. It was held in *Harbison v. Timmons,* 139 Ill. 167, under similar circumstances, that ''before a bidder at a judicial or execution sale can be compelled to comply with his bid, or held liable for loss on a second sale, he must be notified of an intended application to the court for such an order, that he may show cause, if he can, against it.'' In the instant case the first time respondent was permitted to contend that the order of June 2, 1950 was erroneous was upon the issuance of the rule to show cause; and in answer to the rule, respondent did, and had the clear legal right to, question the legality and validity of those orders. This is in consonance with logic and the law, for otherwise the rule would in effect be meaningless.

██ Moreover, neither of those orders was preceded by any order fixing or determining any of the rights of any of the parties to the liquidation or by any order purporting to settle or determine any of the issues raised by the pleadings. Two of the prayers of the supplemental amendment filed August 1, 1949, many months before the filing of the petition for in-

structions, were: "(5) that all of the acts of the alleged newly elected directors and officers be declared to be illegal and void"; and "(6) that this court may either find that the extension of the trust was void and all acts done thereunder were void and illegal, or it may find that Hillebrecht was disqualified to serve as a Voting Trustee or as an officer and director and that the appointment of Benjamin Wham as successor trustee subsequent to the acquisition of the jurisdiction by this court was void and without force and effect, and that he is disqualified to serve." No orders were entered in the main litigation with respect to those prayers; and conceivably when a decree is entered on these issues, it may declare that the voting trust is void and therefore non-existent; that all acts done thereunder were void; that all of the acts of the newly elected directors and officers of the corporation were illegal and void; and that neither Hillebrecht nor Wham is a voting trustee. It is clear that at all times from March 7, 1950, when the petition for instructions was filed, to June 28, 1950, the rights of these individuals to act as officers and directors of the corporation, and the right of the corporation to act through them, had not been determined, and were issues in this case, as was the question whether or not the voting trust was in existence, and whether these individuals had the right to act as two of the three voting trustees. Until these questions were determined there could be no final order. If it were to be held that the orders of June 2 and June 28 were final, then the chancellor in effect would have ordered a liquidation of the corporation, as prayed in the complaint as amended, while that question was still in issue. The courts of this State have variously defined a final order. In general they have held that an order or decree, to be final and appealable, must terminate the litigation between the parties on the merits of the cause so that, if affirmed on

118

review, the trial court has only to proceed with the execution of the order or decree. *Roddy v. Armitage-Hamlin Corp.*, 401 Ill. 605, citing various recent Illinois decisions; see also the earlier case of *Gray v. Ames*, 220 Ill. 251, which holds that a final decree is one which fully decides and finally disposes of the entire merits of the case.

As to the merits of the controversy it is urged *inter alia* by respondent that notwithstanding the general equity jurisdiction of the circuit court, it did not have jurisdiction to enter the orders of June 2 and June 28 or to conduct the sale of property by open-court bidding such as took place. In the proceedings before JUDGE PRYSTALSKI he stated that the trustees could act without the court, and their counsel so agreed; they were invested with broad powers in the trust agreement, and as long as they acted properly, they, and not the chancellor, had the power to direct the sale. In *Metcoff v. Farr*, 337 Ill. App. 662, the question arose whether the chancellor should have ordered a judicial sale as prayed by plaintiffs, and the court held that the complaint failed to state a case for equitable jurisdiction. In *First National Bank of Chicago v. Bryn Mawr Beach Building Corp.*, 333 Ill. App. 223, the powers and duties of the liquidation trustee were substantially the same as those in the case at bar, and the question of jurisdiction likewise arose. The court held that so long as a trustee exercises discretionary powers conferred upon him honestly and reasonably, a court of equity has no right to interfere, citing *Altschuler v. Chicago City Bank & Trust Co.*, 380 Ill. 137. In *Koenig v. Bickel*, 338 Ill. App. 21, we had occasion to consider the limitation on the court's exercise of its powers over trustees, and held it to be the well established rule in this State that where trustees in the exercise of their discretionary powers honestly and reasonably enter into business engagements, courts of equity have no

119

right to interfere, and in consonance with various decisions therein cited, we said that ''having been vested with broad discretionary powers, including the power of sale, the trustees in the instant proceeding had the right to enter into a sales agreement with Johnson, and in the absence of proof of fraud, bad faith or abuse of discretion, neither the chancellor nor this court on review would be justified in interfering with the exercise of such powers within the provisions of the trust instrument.'' If, as we hold, the chancellor had no jurisdiction to enter the orders of June 2 and June 28, 1950, when none of the issues in the main litigation had been determined or even tried, respondent had the clear legal right to·question their validity in responding to the rule to show cause, and ultimately, as an incident to its appeal from the order entered April 24, 1951 providing in substance for the specific enforcement of the sale of the assets of the corporation, to question the validity of all orders entered in the proceedings, respecting the sale of the corporate assets.

 The corporation and the trustees proceeded on the theory that respondent's bid of $625,000 was made in the course of a judicial sale. However, it is manifest that none of the requisites of a judicial sale were present. Prior to May 4, 1950 only two orders having any bearing on the question involved in this case had been entered: (1) an order by JUDGE PRYSTALSKI, on October 15, 1946, which provided that the trustees continue their efforts to make a satisfactory sale and distinctly set out that the order should not be construed to the effect that the assets should be sold; and (2) a ruling of March 7, 1950 on the petition of the trustees and the corporation asking for instructions with respect to respondent's offer to purchase the corporation's property for $540,000, requiring the parties in interest to answer, and setting the matter for hearing at a later date. The authorities are fairly in

accord that a judicial sale must be the result of judicial proceedings and must be based upon a prior order, decree or judgment directing that the property be sold, as distinguished from a judicial assent to the sale of property under statutory provision. 31 Am. Jur., Judicial Sales, §§ 2, 21; *First National Bank of Plainville v. Barons,* 109 Kan. 493, 200 Pac. 297; *In re Backesto's Estate,* 63 Cal. App. 265, 218 Pac. 597; *Morehead v. Bennett,* 219 N. C. 747, 14 S. E. (2d) 785. Respondent's counsel say that there is no reported case in which a sale without a prior order, judgment or decree of court has been held to be a valid judicial sale, and none is cited in any of the briefs except *Payne v. Payne,* 179 Va. 562, 19 S. E. (2d) 690, where, in interpreting the partition statute of Virginia, the court held that the sale there at issue could be approved and consummated in the course of the proceedings in partition without a prior order. In Illinois the statute specifically requires a decree of partition fixing the rights of the parties and an order of sale; consequently the results in the *Payne* case could not be achieved even in a partition suit in Illinois. Moreover, at judicial sales or auctions, or at a bidding contest such as developed in these proceedings, a bid is merely an offer to purchase and remains so until it is accepted and confirmed by the court. Prior to acceptance, it may be withdrawn. 50 C. J. S. Judicial Sales, § 22b; *Blossom v. Railroad Company,* 3 Wall. (70 U. S.) 196, 18 L. Ed. 43; *Grotenkemper v. Achtermeyer & Co.,* 74 Ky. 222; *Nebraska Loan & Trust Co. v. Hamer,* 40 Neb. 281, 58 N. W. 695; and *Evans v. 2168 Broadway Corporation,* 281 N. Y. 34, 22 N. E. (2d) 152. Appellees do not seriously question this rule, but they say that respondent was barred and estopped from withdrawing its bid by reason of its conduct and participation in the bidding. One of the acts urged is that respondent's original offer of $540,000 induced the filing by the

trustees and the corporation of the original petition relative to the sale of the property. As heretofore pointed out, the filing of the petition was Mr. Biossat's suggestion; he had properly advised the trustees that they had the power to sell the property independently of the court, but thought "it might be taken as an affront to the Court." The fact remains that the petition was merely precautionary and related only to the original offer of respondent to buy the property for $540,000; it was certainly not the basis for the open bidding that later followed.

 Another act urged as constituting estoppel is that respondent's last bid was "kept open" by reason of Mr. Satinover's illness and delayed the court in acting on or accepting the offer of $625,000. This contention does not square with the record. The last continuance was granted after respondent had bid $625,000 at the request of Mr. Altheimer, counsel for David W. Pollock. Nor is there any support in the record for the assertion that when respondent bid $625,000, "it was the express understanding that it would keep its bid good." The order continuing the May 4 hearing to May 29 recited that "the court will receive any further or other bids higher or better than the bid of $625,000 this day made in open court by Balaban & Katz . . . ." This, it seems to us, conclusively shows that respondent's bid was not accepted before it was withdrawn at the outset of the hearing on May 29. The facts urged by appellees fall far short of making out a case of estoppel.

In the view we take it will be unnecessary to decide the propriety of the order declaring that the dissent of George Hoffman, nominee for respondent, was invalid, or other points raised.

Pending the appeal, appellees made two motions to dismiss the appeal from the various orders entered in the course of the proceeding, which were reserved to hearing; both of these motions are denied.

122

In summary, the long record presented and the voluminous briefs filed by the parties covering the points herein discussed grew out of the attempted sale of the property to respondent for $540,000 which could have been made without court approval. The proceeding was initiated by the corporation and the trustees upon the petition for instructions which JUDGE PRYSTALSKI and counsel had fully understood to be merely advisory; but in the course of the proceedings that followed the initial hearing, the court, as counsel say, "took hold and soon lost sight of the real objective of the proceeding," with the result that a bidding contest ensued, from which one bidder, Pollock, withdrew when his bid was bettered, and the other bidder (respondent) withdrew before its bid was accepted and after it had advised the court of its intended withdrawal.

For the reasons indicated, the orders appealed from should be reversed, and it is so ordered.

*Orders reversed.*

BURKE, P. J. and NIEMEYER, J., concur.